1
2
3
4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

5
6
7

| | |
|---|---|
| FIZZ SOCIAL CORP., | Case No. 25-cv-03995-CRB |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** |
| MAPLEBEAR, INC., et al., | |
| Defendants. | |

8
9
10
11
12

I. **BACKGROUND**

13   In this trademark case, Plaintiff Fizz Social Corp. (FSC), a social media platform,
14 accuses Defendants Maplebear, Inc., doing business as Instacart (Instacart), and Partiful
15 Co. of exploiting its FIZZ mark in a competing venture.[1]  FSC now seeks a preliminary
16 injunction barring Defendants from using the FIZZ mark, among other things.  See Mot.
17 (dkt. 11).  The Court DENIES the motion.

18   I.   **BACKGROUND**

19      A.   **Fizz Social Corp.**

20   FSC grew out of two Stanford students' vision of "a private platform centered
21 around common experiences, starting with campus life."  Solomon Decl. (dkt. 12) ¶ 4.
22 They initially launched the platform on the Apple App Store on January 25, 2021 under the
23 name "Buzz," which referred to the "buzz" on campus.  Id. ¶ 5.  They rebranded as "Fizz"
24 on January 5, 2022, intending to evoke "the dynamic nature of campus culture."  Id.[2]  Fizz
25 users "verify with their student (.edu) email to access their college Fizz community," and
26 then can "post images, videos, events, polls, GIFs, links, direct messages, and so much

27

28
---
[1] For the sake of simplicity, this order frequently refers to Defendants in the collective.
[2] FSC incorporated its slogan into the name of its App: "Fizz: What's Fizzin'?"  Id. ¶ 31.

United States District Court
Northern District of California

more" to that entire campus-specific community, "ensuring privacy, intimacy, and safety." Id. ¶¶ 6, 10.  Posts on Fizz are anonymous.  Id. ¶¶ 23, 34, 43; Jacob Decl. (dkt. 41-1) Ex. 28 at 2.  Users view content through a scrollable feed of anonymous posts.  Jacob Decl. Ex. 17.

The Fizz platform grew rapidly at Stanford.  Solomon Decl. ¶ 7.  Less than three months after launching, about 95% of Stanford undergraduates were registered on Fizz. Id. ¶ 8.  Fizz expanded to other college campuses, and is now operating at over 400.  Id. ¶¶ 9, 13.  At many of those schools, more than 90% of the student body is on Fizz.  Id. ¶ 16. One use for Fizz is to publicize events: "[f]raternities and sororities could post an invitation to an upcoming party, and students throughout the community . . . would instantly receive the invitation."  Solomon Decl. ¶ 11.  Over 130,000 events have been organized through Fizz, ranging from parties to sporting events.  Id. ¶ 18.  Fizz uses an "ambassador program," through which students on campus generate interest in Fizz.  Id. ¶ 19.  Fizz also has over 3,000 volunteer student moderators nationwide who work to maintain civility on the platform.  Id. ¶ 20.  FSC has spent about $9.4 million on launches and campus contractor expenses.  Solomon Decl. ¶ 21.

On May 9, 2023, FSC debuted the Fizz Marketplace, which allows users to buy and sell items within the users' particular campus communities.  Id. ¶ 23.  The platform launched nationwide in early 2024.  Id.  Students use the Marketplace to sell things like clothes, textbooks, and bikes to fellow students.  Id.; see also id. ¶ 43 (image of Fizz Marketplace on phones).  FSC does not provide a snack and beverage delivery service.  Id. ¶ 84.  Nor does FSC handle the posting, delivery, or payment on the Marketplace—rather, it provides a forum for users to connect.  See Jacob Decl. Ex. 22 at 4.

In September 2024, FSC began running ads on Fizz.  Id. ¶ 27.  Brands advertise on Fizz as a way to reach a Gen-Z audience.  Id.  Also in 2024, FSC established a general Fizz feed that includes users who are not in college.  Id. ¶ 29.  That product is called Global Fizz.  Id. ¶ 30.  It does not include the Fizz Marketplace product.  See Jacob Decl. Ex. 11.

FSC has used the FIZZ mark continuously nationwide since January 5, 2022.  Id. ¶

33.  FSC also applied for federal registration of its marks by filing federal trademark applications in January 2024 and May 7, 2025.  See Solomon Decl. Exs. 26, 27.  FSC's mark sometimes appears like this:



Solomon Decl. ¶ 36.  On the app itself, the bee image appears without the word "Fizz," and one of the categories of posts is "Fizzin'."  Id. ¶ 37.  Sometimes the FIZZ mark appears with the bee image and bubbles around it:



Id. ¶ 74.

### B.    Instacart

Instacart is an online platform that allows users to shop for groceries from local retailers and have them delivered by personal shoppers.  Weintraub Decl. (dkt. 40-3) ¶ 3. It was founded in 2012 and now partners with over 1,800 brands to deliver groceries from nearly 100,000 stores.  Id. ¶¶ 3, 5.  To order groceries, Instacart customers use a mobile app or Instacart's website, select a virtual storefront (like Safeway) where shopping and delivery services by a personal Instacart shopper are available, then select items and check

out.  Id. ¶¶ 11, 12.  Instacart presents the customer's order to available shoppers, who accept the order, buy the customer's items from the store, and deliver them to the customer.  Id. ¶ 12.  Instacart has over 20 million annual users.  Id. ¶ 13.

### C.    Fizz by Instacart

On May 6, 2025, Instacart launched the Fizz by Instacart app.  Id. ¶¶ 2, 16.  Fizz by Instacart is an online delivery app that facilitates group orders of drinks and snacks.  Id. ¶ 2.  Instacart built the app on top of Instacart's existing grocery delivery e-commerce platform.  Id.  Fizz by Instacart features a flat delivery fee, no membership requirement, earned savings, and automatic payment splitting among group members.  Id. ¶ 16. Instacart selected the name Fizz because it "evokes both carbonated beverages and the spirited energy of celebrations and special occasions."  Id. ¶ 17.

Customers can access Fizz by Instacart either by downloading the app or by navigating to fizz.com on a mobile browser.  Id. ¶ 18.  Customers are taken to a registration page where they can create an account if they are 21 or older.  Id.  They are then taken to a virtual storefront where they can purchase drinks and snacks.  Id.  They can "Start a Party Cart" in order to invite others to join their shopping experience.  Id. ¶ 19.  To join, those users must confirm that they are 21 or older and sign up for an account.  Id. ¶ 20.  When any user adds an item to the Party Cart, all users participating in that Party Cart can see what was added and by whom; when all members of the Party Cart have chosen and paid for their items, the host can initiate a checkout and schedule the group order.  Id. ¶¶ 21, 22.  Each person pays only for what he or she ordered.  Id. ¶ 22.  An Instacart shopper then handles the shopping and delivery to a single specified location.  Id. ¶ 23. Fizz by Instacart does not target college campuses—both because users must be 21 or over to register for and use the app, and because "Instacart has a policy, which it communicates to shoppers, of not delivering alcohol to college campuses."  Id. ¶ 40.  Fizz by Instacart sees its main competitors as other food delivery apps, like DoorDash, UberEats, GoPuff, Total Wine, Saucey, and Minibar.  Id. ¶ 41.  Fizz by Instacart "does not facilitate content creation, forums, discussions, or threads."  Id. ¶ 42.  There is no bulletin board feature, and

users cannot post or engage with each other's posts.  Id.  To communicate with other people about the Party Cart, users must use a different application.  Id. ¶ 43.  Users are not anonymous.  Id. ¶ 44.

The mark that Fizz by Instacart uses looks like this:



Weintraub Decl. ¶ 56, Ex. M; Jacob Decl. Ex. 30.

**D.    Partiful**

Partiful owns and operates an event-hosting platform that allows users to create invitations to specified individuals, manage RSVPs, and send follow-up communications about events.  Murthy Decl. (dkt. 41-2) ¶ 3.  Its chief competitors are Evite and Paperless Post.  Id. ¶ 5.  Partiful, founded in 2020, operates via text message, a website, and a mobile app.  Id. ¶ 4.  It has millions of active users.  Id. ¶ 6.  While Partiful is popular with users in their twenties and thirties, its users are from all age groups.  Id. ¶ 7.  Partiful does not have a bulletin board or allow users to post general information, nor does it allow anonymous posts.  Id. ¶ 4.

On May 6, 2025, Partiful began offering an integration of Fizz by Instacart on the

United States District Court
Northern District of California

Partiful platform.  Id. ¶ 8.  Partiful is "not an owner, co-developer, or partner in" Fizz by Instacart.  Id.  Instead, Partiful and Instacart entered into an agreement that allows Partiful's users to see a banner that says "Powered by FIZZ – Drinks & snacks delivered" and to click a button that says "Start a Group Order."  Id. ¶¶ 8, 9.  When a user clicks that button, a page appears that allows the user to enter a delivery address and states that "Fizz is a 21+ app from Instacart."  Id. ¶ 10.  A group order link then appears on the Partiful event page, and if the user clicks a "Start Shopping" button, they are taken outside of the Partiful app to either Fizz.com or the Fizz by Instacart mobile app.  Id. ¶¶ 11, 12.

### E.    Procedural History

FSC contends that Instacart and Partiful are infringing on FSC's FIZZ mark.  It asserts that "Using an identical FIZZ mark, to target the same demographic, and provide the same social event coordination services, is confusing and damaging."  Mot. at 2.  On May 7, 2025, FSC brought suit alleging: (1) common law trademark infringement; (2) false designation of origin and unfair competition, pursuant to 15 U.S.C. § 1125(a); (3) violation of the Anti-Cybersquatting Consumer Protection Act, pursuant to 15 U.S.C. § 1125(d); (4) violation of California's Unfair Competition Law, pursuant to Cal. Bus. & Prof. Code § 17200; (5) and declaratory relief.  See Compl. (dkt. 1).  FSC has now brought a motion for preliminary injunction based on the trademark claims.  See Mot.; Reply (dkt. 47).  Defendants oppose the motion.  See Opp'n (dkt. 40-2); Surreply (dkt. 49-2).  The Court held a motion hearing on July 10, 2025.  See Motion Hearing (dkt. 53).

## II.    LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  The party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest.  See id. at 20.  Alternatively, the moving party must demonstrate that "serious questions going to the merits were raised and the

6

1  balance of hardships tips sharply in the plaintiff's favor," and that the other two <u>Winter</u>

2  elements are met.  <u>Alliance for Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1134–35 (9th Cir.

3  2011).

4  **III.    DISCUSSION**

5       FSC argues that it is entitled to a preliminary injunction because it has satisfied each

6  of the <u>Winter</u> elements.

7       **A.    Likelihood of Success**

8       A party seeking a preliminary injunction must establish a likelihood of success on

9  the merits.  <u>Winter</u>, 555 U.S. at 20.  FSC argues that it is likely to succeed on the merits of

10  its trademark infringement claims[3] because (1) it has a protected ownership interest in its

11  FIZZ marks and (2) Defendants' use of FIZZ in connection with its app is likely to cause

12  confusion.  Mot. at 3.

13       **1.    Ownership of Marks**

14       The first requirement for trademark infringement is ownership of a valid trademark.

15  <u>See</u> <u>Network Automation, Inc. v. Advanced Sys. Concepts, Inc.</u>, 638 F.3d 1137, 1144 (9th

16  Cir. 2011).  FSC contends that it owns valid and protectable trademarks.  Mot. at 3.

17  "[E]ven if a trademark is not federally registered, it may still be enforceable under § 43(a)

18  of the Lanham Act."  <u>Matal v. Tam</u>, 582 U.S. 218, 225 (2017).  A plaintiff who cannot

19  point to a federally registered trademark must demonstrate (1) prior use of the mark in

20  commerce, and (2) entitlement to protection.  <u>OpenAI, Inc. v. Open Artificial Intelligence,</u>

21  <u>Inc.</u>, 719 F. Supp. 3d 1033, 1046–47 (N.D. Cal. 2024).

22       As to prior use, the Lanham Act requires "the bona fide use of a mark in the

23  ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. §

24  1127.  Courts use a "totality of the circumstances approach" in evaluating priority of use,

25  which turns on "first, adoption, and second, use in a way sufficiently public to identify or

26

27  [3] These are the claims for trademark infringement, false designation of origin, and unfair competition.  Mot. at 3.  "Claims for false designation of origin under the Lanham Act and

28  unfair competition under California common law both share a common test: likelihood of confusion."  <u>Microsoft Corp. v. Buy More, Inc.</u>, 703 F. App'x 476, 479 (9th Cir. 2017).

United States District Court
Northern District of California

distinguish the marked goods in an appropriate segment of the public mind" "as belonging to the owner." OpenAI, 719 F. Supp. 3d at 1047 (internal quotation marks omitted). Here, there is no dispute that FSC used the FIZZ marks in connection with the Fizz platform since January 5, 2022. Solomon Decl. ¶¶ 5–7. Apple made the Fizz platform available nationwide through the App Store that same day. Id. ¶¶ 31, 33. And the fizzsocial.app website went live on January 27, 2022. Id. ¶ 35. FSC has received national media attention. Id. ¶¶ 23, 30, 36, 40 (Forbes, Fortune. TechCrunch, Pulse 2.0, Startup20 India, Kolsquare, Fast Company). Moreover, FSC's use has been both continuous and nationwide. Id. ¶ 15. FSC has therefore made bona fide use of its FIZZ marks since January of 2022.

As to entitlement to protection, "[a]n identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992). FSC argues that its FIZZ marks are inherently distinctive. Mot. at 5. Marks fall into "one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." Zobmondo Ent., LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010). FSC argues that its FIZZ marks are suggestive. See Mot. at 5; see also Opp'n at 7 (agreeing that FSC's FIZZ marks are suggestive). "A suggestive mark is one for which 'a consumer must use imagination or any type of multistage reasoning to understand the mark's significance . . . the mark does not describe the product's features, but suggests them." Zobmondo, 602 F.3d at 1113 (quoting Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998)). Because the word "fizz" does not literally describe a social media app, but requires a mental leap from the bubbles in a carbonated drink to "the joyful, spontaneous quality of social connection and collaboration," Mot. at 5; see also Solomon Decl. ¶ 5 ("the dynamic nature of campus culture"), id. ¶ 40 ("fun and effervescen[ce] . . . that's bubbling up"), it is a suggestive mark. See Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1058 (9th Cir. 1999) ("MovieBuff" mark was suggestive where it "require[d] a

8

1  mental leap from the mark to the product," which was software with a searchable database

2  of entertainment industry information).  Because the Fizz marks are suggestive, they "are

3  deemed inherently distinctive," and they are entitled to protection.  See Two Pesos, 505

4  U.S. at 768.

5        Defendants do not actually dispute either of these points, but they argue that FSC's

6  analysis focuses on the wrong market.  Defendants argue that while FSC has priority in

7  "social media services," FSC "has never offered grocery delivery," and so it is Instacart

8  that has priority in the relevant "grocery delivery" market.  Opp'n at 6.  Defendants note

9  that FSC applied for trademark protection in grocery delivery on May 7, 2025—"the day

10 after Instacart's launch," suggesting that FSC knows that it is not in the grocery delivery

11 market.  Id.  Defendants are correct that the prior use must be "in the same industry and

12 market or within the senior user's natural zone of expansion."  Brookfield Commc'ns, 174

13 F.3d at 1047.  And there is no question that FSC is not in the grocery delivery market.  But

14 the Ninth Circuit has cautioned against "overemphasiz[ing] differences in principal lines of

15 business, as 'the relatedness of each company's prime directive isn't relevant.'"  Id.

16 (quoting Dreamwerks Prod. Grp., Inc. v. SKG Studio, 142 F.3d 1127 (9th Cir. 1998)).

17 Courts are to ask "whether the consuming public is likely somehow to associate [one

18 party's] products with [the other party's]."  Id.  The "principal line[] of business" of

19 Instacart is grocery delivery, but the "Fizz by Instacart" initiative, and particularly

20 Partiful's integration of Fizz by Instacart on the Partiful platform, are about group ordering

21 of drinks and snacks in connection with party planning.  The Fizz platform, broadly

22 speaking, allows for the coordinating of group events.  This order will examine the

23 proximity of the parties' goods and services more closely in connection with the likelihood

24 of confusion factors, but for present purposes it is sufficient to say that both FSC and

25 Defendants offer free mobile apps relating to social coordination, which is a similar

26 market.

27        Accordingly, FSC is likely to succeed in demonstrating that it has a protected

28 ownership interest in its FIZZ marks.

9

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.    Likelihood of Confusion

The second requirement for trademark infringement is a likelihood of confusion. See Network Automation, Inc., 638 F.3d at 1144.  There is a likelihood of confusion between two products "when consumers 'are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques.'"  Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 825 (9th Cir. 1993) (quoting Metro Publ'g, Ltd. v. San Jose Mercury News, 987 F.2d 637, 640 (9th Cir. 1993) (abrogated on other grounds)).  The Ninth Circuit analyzes likelihood of confusion by referring to eight factors identified in AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348–49 (9th Cir. 1979), abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792 (2003): (a) strength of the mark; (b) similarity of the marks; (c) proximity of the goods/services sold; (d) similarity in the marketing channels used; (e) type of goods/services and degree of care likely to be exercised by purchasers; (f) evidence of actual confusion; (g) defendant's intent in selecting its mark; and (h) likelihood of expansion into other markets.  "[A]lthough these Sleekcraft factors 'channel the analytical process,' they do not necessarily dictate a result."  Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1125 (9th Cir. 2014) (quoting Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1141 (9th Cir. 2002)).  "Because the factors are 'fluid,' a 'plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them.'"  Pom Wonderful, 775 F.3d at 1125 (quoting Surfvivor Media, Inc. v. Survivor Prods., 406 F.3d 625, 631 (9th Cir. 2005)).  Three especially important factors in cases involving the Internet are the similarity of the marks, the relatedness of the goods and services, and the simultaneous use of the Internet as a marketing channel.  Network Automation, 638 F.3d at 1146.[4]

### a.    Strength of mark

"The scope of the trademark protection" given a mark "depends upon the strength

---

[4] Network Automation referred specifically to "confusion in the context of Internet domain names," which this case does not involve.  See id.

United States District Court
Northern District of California

of the mark, with stronger marks receiving greater protection than weak ones." Entrepreneur Media, 279 F.3d at 1141. "This is so because a strong mark is 'inherently distinctive,' . . . and therefore it is more likely that consumers will be confused by another's use of the same or similar mark." Id. (quoting Sleekcraft, 599 F.2d at 349). A trademark's strength "is evaluated in terms of its [i] conceptual strength and [ii] commercial strength." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1207 (9th Cir. 2000).

### i.    Conceptual Strength

As to conceptual strength, courts are to place a mark on a "continuum of marks from generic, afforded no protection; through descriptive or suggestive, given moderate protection; to arbitrary or fanciful[,] awarded maximum protection." E.&J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992) (cleaned up). As already discussed, the parties agree that FSC's FIZZ marks are suggestive, see Mot. at 5; see also Opp'n at 7 (agreeing that FSC's FIZZ marks are suggestive). Indeed, as in Palantir Technologies, Inc. v. Palantir.net, Inc., No. C07-03863 CRB, 2008 WL 152339, at *3 (N.D. Cal. Jan. 15, 2008), because it requires a mental leap to get from the FIZZ marks to FSC's services, those marks are "at the far end of the suggestive spectrum, very near to arbitrary or fanciful, and thus . . . of at least moderate strength." The marks "are deemed inherently distinctive" and are entitled to protection. See Two Pesos, 505 U.S. at 768.

### ii.    Commercial Strength

As to commercial strength, courts are to look to "'actual marketplace recognition,'" recognizing that "'advertising expenditures can transform a suggestive mark into a strong mark.'" Network Automation, Inc., 638 F.3d at 1149 (quoting Brookfield Commc'ns, 174 F.3d at 1058). There is support in the record for FSC's marketplace recognition: FSC is now at over 400 college campuses, and at many of them, 90% of the student body uses the app; FSC has spent about $9.4 million on launches and campus contractor expenses; and FSC has received national media attention. Solomon Decl. ¶¶ 13, 16, 21, 23, 30, 36, and

United States District Court
Northern District of California

40.[5]  Defendants argue, though, that FSC's mark is commercially weak because FSC "is less than three years old" and it "is not ranked anywhere near the top of social media companies by user base."  Opp'n at 7 (citing Jacob Decl. Ex. 31).  Defendants add that "there are many apps on the App Store also called Fizz," some of which also offer services to college students.  Id. at 8 n.5 (citing Jacob Decl. Ex. 10, Ex. 28 at 1).

FSC has the stronger argument.  Defendants offer no authority supporting their contention that a product less than three years old is commercially weak.  And while other social media companies are more widely used, see Jacob Decl. Ex. 31 at 1 ("YouTube and Facebook are the most-widely used online platforms. . . . TikTok, LinkedIn, X . . . and Snapchat" have smaller shares), id. at 2 (listing additional social media platforms for ages 18–29), a mark is not weak simply because its owner is not more popular than YouTube or Facebook—if that was the case, then hardly any company's marks would merit protection.

Although "[i]n a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd," see Miss World (UK) Ltd. v. Mrs. America Pageants, Inc., 856 F.2d 1445, 1449 (9th Cir. 1988) (internal quotation marks omitted) (abrogated on other grounds in Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1355 (9th Cir. 1985) (en banc)); see also M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073, 1088 (9th Cir. 2005) ("Use of similar marks by third-party companies in the relevant industry weakens the mark at issue."), it is not clear whether the "Fizz" apps in the App Store are actually commercial competitors to FSC's.  See Jacob Decl. Ex. 10 (FSC app; "Fizz - #1 Student Money App"; "Fizz – Teen Chat"; "FiiZ Drinks App"; and [the Fizz by Instacart app, which is listed as "Fizz: party drinks & snacks").  "A crowded field of similar marks is only relevant if there are similar marks on similar goods."  Internet Specialties v. ISPWest, No. CV 05-3296 FMC AJWX, 2006 WL 4568796, at *2 (C.D. Cal. Sept. 19, 2006).  Similarly, while a company called ShoulderTap Technologies is apparently involved in a separate lawsuit accusing FSC of trademark

---

[5] Although in September 2024, FSC started to allow ads on Fizz, the record does not reflect FSC's advertising revenue.  See Solomon Decl. ¶ 27.

1    infringement, its product is a "Fizz" debit card for college students, which would appear to

2    be very different.  See Jacob Decl. Ex. 28 at 1.  Where the record does not reflect "'the

3    extent of third-party uses . . . [t]he probative value of this evidence is [] minimal.'"  Palm

4    Bay Imports v. Veuve Clicquot, 396 F.3d 1369, 1373–74 (Fed. Cir. 2005) (quoting Han

5    Beauty, Inc. v. Alberto-Culver Co., 236 F.3d 1333, 1338 (Fed. Cir. 2001)).  FSC's

6    evidence of commercial strength is therefore not meaningfully diminished by evidence of

7    other Fizz apps in the App Store.

8          Accordingly, because FSC's Marks are conceptually suggestive, and they are

9    commercially strong, FSC's Marks are strong.

10                         **b.    Similarity of marks**

11         "'Similarity of the marks is tested on three levels: sight, sound, and meaning.'"

12   Echo Drain v. Newsted, 307 F. Supp. 2d 1116, 1126 (C.D. Cal. 2003) (quoting Sleekcraft,

13   599 F.2d at 351).  "[T]he greater the similarity between the two marks at issue, the greater

14   the likelihood of confusion."  GoTo.Com, 202 F.3d at 1206.  Courts are to consider marks

15   in their entireties and as they are encountered in the marketplace.  Sleekcraft, 599 F.2d at

16   351.  While courts "may give greater weight to a dominant feature of a mark (i.e., that

17   which is likely to make a greater impression on an ordinary buyer), in the end the court's

18   analysis must consider and compare the marks in their entirety."  SG Servs. Inc. v. God's

19   Girls Inc., No. CV 06-989 AHM (CTx), 2007 WL 2315437, at *4 (C.D. Cal. May 9, 2007).

20   Additionally, "similarities weigh more heavily than differences," Sleekcraft, 599 F.2d at

21   351, and "a lesser degree of similarity is required when a trademark holder's mark is

22   strong," Pom Wonderful, 775 F.3d at 1130.

23         Here, the analysis differs depending on whether the Court is comparing the word

24   marks or the combined marks.

25         The parties' word marks are clearly identical.  Notwithstanding Defendants'

26   reference to its product as "Fizz by Instacart," it appears on Partiful's website

27   announcement simply as "Fizz," the same name as FSC.  See, e.g., Second Solomon Decl.

28   (dkt. 47-1) ¶ 23 ("Partiful + Fizz: The Perfect Party Pair.").  To access the Fizz by Instacart

United States District Court
Northern District of California

1   service from Partiful, a customer clicks on "Start a group order," which they are told is

2   "Powered by Fizz."  See Murthy Decl. ¶ 9.  Instacart's CEO introduced Defendants' app

3   through a LinkedIn post referring to it as Fizz.  Solomon Decl. ¶ 52 ("Say hi to Fizz, our

4   new group ordering app").  In addition, Defendants sought trademark protection for the

5   standard character marks around the word "FIZZ," apart from any image, color, or font.

6   Id. ¶ 87; Exs. 53, 54.

7       Because the words are identical, they have the same sight and sound.  They also

8   have, from a consumer perspective, the same meaning.  That FSC chose the word "fizz"

9   because it evokes dynamic, effervescent campus culture, Solomon Decl. ¶ 5, and

10  Defendants chose the word "fizz" because it "evokes both carbonated beverages and the

11  spirited energy of celebrations and special occasions," Weintraub Decl. ¶ 17, is irrelevant[6]

12  if those meanings are not apparent to the consumer.  Even if those meanings were

13  somehow observable to a consumer, they are not meaningfully different: both rely on the

14  word's reference to bubbles to communicate excitement and energy.

15      The combined marks are fairly different, however:

16

   

25      While both prominently feature the word "FIZZ" in capital, sans serif lettering, and

26  (sometimes) blue bubbles around that word, Defendants' FIZZ mark uses a fatter, rounder

27

28  _____
    [6] The reasons the parties chose their names might of course be relevant to intent.

United States District Court
Northern District of California

font, in bright yellow with white bubbles inside the letters, and an ombre blue background. FSC's FIZZ mark uses a skinnier, more angular, pale blue-gray font set on a black background, with a blue-purple bee image above the word FIZZ (a remnant of its original name, Buzz), and the tagline: "What's fizzin' in your community?" below it. The bubbles on both are different: Defendants' are turquoise, with white circles within, and FSC's are a royal blue, with more subtle light accents. The colors of the two marks are not even in the same palate, and are far more distinct than the maroon colors at issue in Pom Wonderful, 775 F.3d at 1128 (both marks were in "white [font] that is offset by a dark maroon background."). Although both include the same prominent word and bubbles, the Court does not find them very similar. See Vertos Med., Inc. v. Globus Med., Inc., No. 09-1411 PJH, 2009 WL 3740709, at *6 (N.D. Cal. Nov. 6, 2009) ("[a] determination that two marks are similar in 'appearance' essentially amounts to an 'I know it when I see it' analysis."). That said, "a lesser degree of similarity is required when a trademark holder's mark is strong." Pom Wonderful, 775 F.3d at 1130.

Because the word marks are identical but the combined marks are fairly different, it becomes all the more important how customers encounter the two brands in the marketplace. See Sleekcraft, 599 F.2d at 351. FSC asserts that "consumers typically engage with brand names through text-based formats—search results, push notifications, and word-of-mouth referrals." Second Solomon Decl. ¶ 22. True, the way that some customers initially hear about the two apps might be through the media, and in that case the identical word marks would be significant. See Dreamwerks, 142 F.3d at 1131 (explaining that the "man-in-the-moon DreamWorks logo, when presented in the full regalia of a movie trailer, is quite distinctive" but that "'DreamWorks' often appears in the general press and in Industry magazines without the logo"). However, unlike in Dreamwerks, the competing products here are apps, which customers must download to use. The way that customers learn more about the apps and download them is through the App Store. Jacob Decl. Ex. 30. Typing in "Fizz" on the App Store yields a list of results including:

- FSC's app, which appears as "Fizz: Your Authentic Community," with just the bee image on the left,
- "fizz - #1 student money app," with the word fizz in black over a yellow background on the left,
- "Fizz – teen chat," with the word fizz on a black background and purple and pink bubbles around it on the left,
- "FiiZ Drinks App," with "FiiZ Drinks" on a turquoise background and image of a glass with two straws and two bubbles on the left, and then
- Defendants' app, which appears as "Fizz: party drinks & snacks," with Defendants' combined mark on the left.



**Fizz: Your Authentic Community**
Fizz is your go-to place to connect with the people who matter to you most. On Fizz, you can join your school's private community or your nearby community...
View more >



**Fizz - #1 Student Money App**
Fizz is the #1 money app for students trusted by over 100,000 young adults. Named the best credit builder by Business Insider, Fizz is there for you in...
View more >



**Fizz – Teen Chat**
Get ready to dive into the world of Fizz, a fresh and exciting social app designed especially for the Gen Z. We know you value authentic connections and...
View more >



**FiiZ Drinks App**
We think caffeine is cool! Soda, Salty, Sweet & everything neat. A serious drink experience! Get your drinks at FiiZ! Pre-order now through the app and...
View more >

**Fizz: party drinks & snacks**
get drinks, snacks, and no drama. order together. pay your share. now everyone can add their favorite drinks & snacks to the Party Cart—and only pay for...
View more >

Jacob Decl. Ex. 10. While FSC's app and Defendants' app both bear the name "Fizz," the text following the colons on both apps are different—"Your Authentic Community" versus "party drinks & snacks"— and the images to the left of those names are very different. See id. The marks in that context are not confusing at all. But see Talent Mobile Dev., Inc. v. Headios Grp., No. SA CV 16-464-DOC (DFMx), 2017 WL 6940548, at *6–7 (C.D. Cal. Oct. 3, 2017) (holding, where apps had very different logos, that because marks often appeared without logos, "the difference in logo design is insufficient to remove a

likelihood of confusion.").

Defendants argue, too, that FSC uses the bumblebee logo and not the word "fizz" on the FSC app's home page. Opp'n at 10 (citing Jacob Decl. Exs. 30, 17); see also Jacob Decl. Ex. 28 at 8 (FSC stating in other litigation that "[T]he app's main feed page … uses the Fizz Social bumblebee logo and not the FIZZ mark at all."). FSC maintains that this is not true as to the app's home page, which when opened, initially shows a blue-purple screen with the bee image and, at the bottom in sans serif, all capital, white letters, the word FIZZ. See Reply at 9; Second Solomon Decl. ¶ 7. Once the FSC app is open, although the main image is the bee and then the name of the FSC community (for example, Stanford) the tabs at the top are labeled "Top," "Fizzin'," and "New," as shown below:



Solomon Decl. ¶ 37. So FSC's app does use the word "fizz," but this use is not very similar to Defendants' use, and the bee image is more dominant than the word "fizz."

Similarly, while both parties own websites that employ the word "fizz," see www.fizz.social (FSC's website, with a black background, skinny, sans serif, blue-purple word "FIZZ," which directs viewers to download the FSC app on the App Store); www.fizz.com (Defendants' website, with a royal blue background and the yellow, round, sans serif "FIZZ" word with the bubbles in it, which also directs viewers to the App Store), those websites differ visually, and both direct consumers to the App Store, where the above differences are apparent. See Solomon Decl. ¶ 91. Those differences work to dispel the confusion that might occur simply with the word "fizz." See Arcona, Inc. v. Farmacy Beauty, LLC, 976 F.3d 1074, 1080–81 (9th Cir. 2020) ("no reasonable consumer would be confused" where "the packaging, size, color, shape, and all other attributes—other than the

United States District Court
Northern District of California

term 'EYE DEW'—are not remotely similar.").

Accordingly, while the word marks are identical, both combined marks use the word "fizz," and "similarities weigh more heavily than differences," <u>Sleekcraft</u>, 599 F.2d at 351, the Court nonetheless concludes that the way that consumers encounter the marks in the marketplace makes the marks not very similar.

### c.    Proximity of goods/services

"For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." <u>Sleekcraft</u>, 599 F.2d at 350. "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." <u>Brookfield Commc'ns</u>, 174 F.3d at 1055. "The Ninth Circuit defines 'relatedness' broadly, typically requiring only that the parties participate in the same general industry." <u>Sutter Home Winery v. Madrona Vineyards, L.P.</u>, No. C 05-0587 MHP, 2005 WL 701599, at *9 (N.D. Cal. Mar. 23, 2005).[7]  Goods are related when they are "complementary, sold to the same class of purchasers, or similar in use and function." <u>Ironhawk Techs., Inc. v. Dropbox, Inc.</u>, 2 F.4th 1150, 1163 (9th Cir. 2021).

Three issues are relevant to whether the parties' apps are related: (i) whether they are both used for social coordination and event planning; (ii) whether the Fizz Marketplace is any more closely related to Fizz by Instacart; and (iii) whether the parties sell their apps to the same class of purchasers.

### iii.    Social coordination and event planning

FSC argues that the parties' products are related because they both "provide mobile application-based services centered on social coordination and event planning for Gen-Z." Mot. at 6 (citing Solomon Decl. ¶¶5–46, 49–76).  It adds that both products "are designed

---

[7] Judge Patel made this holding in a case where both parties sold "premium California wines," and cited in support of this point to <u>Dreamwerks</u>, involving the entertainment industry, and <u>American Int'l Group, Inc. v. American Int'l Bank</u>, 926 F.2d 829, 832–33 (9th Cir. 1991), involving financial services. <u>Id.</u>  Neither <u>Sutter Home Winery</u> nor either of the cases it relied on involved internet apps.

to solve the logistical challenges of coordinating social gatherings among peer groups in the Gen-Z demographic." Id. FSC also maintains that the Instagram-Partiful collaboration shows that Defendants view their product "as complementary to event-planning services" like FSC's. Id. at 7. FSC concludes that because the two products have related functions, consumers would expect them to originate from the same source. Id. (citing Palantir, 2008 WL 152339, at *15–16 (use of identical marks likely to cause confusion where both parties' goods and services were related generally to the "computer software industry," even though "lines of business" were "not identical")).[8]

Broadly speaking, both parties' apps "are designed" at least in part "to solve the logistical challenges of coordinating social gatherings among peer groups in the Gen-Z demographic." See Mot. at 6. But it cannot be that any two apps that makes it easier to coordinate things are related. That is defining the apps' purpose at too high a level of abstraction. The parties' products here were not designed for the same purposes to the same degree as the products in Ironhawk Techs., 2 F.4th at 1164 (products both "facilitate file sharing amongst teams," "provide a solution to the same problem: how to make files accessible to multiple remote users," and "occupy the same data management field and involve transferring large files"), or the products in Talent Mobile Development, 2017 WL 6940548, at *6 (competing products, "'Real Caller' and 'Reel Caller[,]' both describe a smartphone app that uses a directory to identify the real identity of the caller").

FSC's app allows members of campus communities to "post images, videos, events, polls, GIFs, links, direct messages, and so much more" to that community only, Solomon Decl. ¶¶ 6, 10, 23, 34, 43; Jacob Decl. Ex. 28 at 2, resulting in a scrollable feed of anonymous posts, Jacob Decl. Ex. 17. It is most like a searchable, digital bulletin board (like Craigslist), and does not only, or even primarily, serve to coordinate social

---

[8] At the motion hearing, FSC argued that it organized events and Defendants provided drinks and snacks for events, so the two services are complementary, "like peanut butter and jelly." FSC might as well have said that the two services are like wine and cheese and salami. See E&J Gallo Winery, 967 F.2d at 1291. Neither food analogy fits the parties' products.

gatherings.  See, e.g., Solomon Decl. ¶ 37 ("Have you had your first kiss yet?"); Jacob

Decl. ¶ 9 ("Being a relationship person at this school is not for the weak."), ("No joke the

best thing Stanford has given me is full access to a free gym nearby."); Jacob Decl. Ex. 17

("silence, pothead.  an alcoholic is speaking.").  Even those posts relating to events are not

really "event planning"—event announcements is a better description.  See Mot. at 6.

FSC's assertion that "Users have planned over 130,000 events using the Fizz Platform," id.

at 4 (citing Solomon Decl. at ¶18), rings false, because the word "planned" does not

accurately describe an announcement that "parties, club socials, club meetings, bar crawls,

sporting events, and everything in between" are happening, see Solomon Decl. ¶ 18.  Nor

is such an announcement really "among peer groups," see Mot. at 6, unless peer groups

means an entire campus.  FSC also does not offer grocery ordering or delivery services, or

allow users to divide the cost of such services.  See Solomon Decl. ¶ 84.

   Defendants take pains to describe their own app as providing mere "grocery

ordering and delivery services."  Opp'n at 8.  That is not entirely correct either, as Fizz by

Instagram involves some coordination for groups—allowing a group of specified members

to place a single order and divide up the ordering and payment between group members.

See Weintraub Decl. ¶ 16.  Instacart's partnership with Partiful pairs that group ordering

and payment functionality with party invitations.  Murthy Decl. ¶¶ 8, 9 (allows Partiful's

users to see a banner that says "Powered by FIZZ – Drinks & snacks delivered" and to

click a button that says "Start a Group Order.").  Users are then taken outside of the

Partiful app to either Fizz.com or the Fizz by Instacart mobile app.  Id. ¶¶ 11, 12.  The

partnership between Defendants therefore offers something more akin to "event planning

services" than what FSC's scrollable bulletin board offers.  See Reply at 3 (noting that

Defendants sought trademarks in "event planning").

   But even accepting that there is some coordination of social groups inherent in both

apps, it is implausible that a user who receives a Partiful invitation to a group of specified

individuals, which requests an RSVP and invites her to start a group order, and who then

navigates away from Partiful to the Fizz by Instacart virtual storefront, could believe that

United States District Court
Northern District of California

Fizz by Instacart originates from or is affiliated with FSC.  Indeed, FSC's use of the word "invitation" to describe an announcement on the Fizz platform to the entire campus community, see, e.g., Solomon Decl. ¶ 11 ("Fizz offered an excellent platform for inviting people to parties.  Fraternities and sororities could post an invitation to an upcoming party, and students throughout the community . . . would instantly receive the invitation."), highlights how different that type of "invitation" is from a digital invitation sent to a select group of invitees who can then RSVP and coordinate who is bringing what.  Compare id. with Murthy Decl. ¶ 3 (Partiful users "organize events, create and send invitations to events, tracks RSVPs and send follow-up communications to guests regarding the events.").  Fizz by Instacart "is centered on logistics and convenience, powered by a national fulfillment platform that took over a decade to build," Surreply at 1 (citing Second Weintraub Decl. (dkt. 49-3) at ¶¶ 3–7); it does not function or look like FSC.

### iv.    Fizz Marketplace

The same is true of Fizz by Instacart as compared to Fizz Marketplace, the offering by FSC that allows users to buy and sell items within the users' particular communities.  Solomon Decl. ¶ 23.  Students in particular FSC communities use Fizz Marketplace to sell things like clothes, textbooks, and bikes to fellow students.  Id. ¶ 43 (image of Fizz Marketplace on phones).  While the existence of Fizz Marketplace means that FSC in a broad sense facilitates sales, Fizz Marketplace does not allow for the ordering or delivery of drinks and snacks, id. ¶ 84, let alone group ordering of those items.  FSC does not handle posting, delivery, or payment.  See Jacob Decl. Ex. 22 at 4.  It is a place for users to post items, which other users can then contact those users about.  In contrast, Fizz by Instacart only functions to facilitate group ordering, payment, and delivery of drinks and snacks.  Weintraub Decl. ¶ 16.  It is difficult to imagine how a Fizz by Instacart user could believe that that app originates from or is affiliated with FSC just because that user is familiar with Fizz Marketplace.

### v.    Class of Purchasers

Finally, the parties are at odds over whether both FSC and Defendants target the

same class of purchasers—Gen Z.  See Mot. at 6; Opp'n at 9.  Goods can be related when they are "sold to the same class of purchasers."  Ironhawk Techs., Inc., 2 F.4th at 1163. FSC aims its product at college campuses.  See, e.g., Solomon Decl. ¶ 10 (explaining campus-specific communities).  Defendants assert that Fizz by Instacart "deliberately avoids targeting college campuses, which make up [FSC's] primary user base." (citing Weintraub Decl. ¶ 40).  Users must be 21 or older to use Fizz by Instacart, and many college students are under 21.  Weintraub Decl. ¶ 40.  Instacart also has a policy of not delivering to college campuses even if the person ordering is over 21.  Id.  And Defendants assert that college students do not really need Fizz by Instacart's services—they already live in close proximity with one another and "can coordinate group orders relatively easily."  Id.

In connection with its reply brief, FSC asserts that it was able to test and refute Defendants' claim that Instacart does not deliver alcohol to colleges.  See Reply at 11 ("Instacart's Fizz App delivers alcohol directly to college campuses"); Second Solomon Decl. ¶ 5 ("Here is a photo of me receiving two separate deliveries of alcohol to New York University's iconic Rubin Hall dormitory, which houses first-year students."); Montagut Decl. (dkt. 47-4) ¶¶ 1–4 (Stanford graduate student declaring that he was able to order beer and snacks to house where Stanford undergraduates lived); Bower Decl. (dkt. 47-4) ¶¶ 1–4 (Stanford graduate student declaring that he ordered beer, hard liquor and snacks to Harvard Science Center).

But such evidence is a red herring.  First, the three declarations represent a very small sample size and do not demonstrate that Fizz by Instacart does a notable amount of business delivering alcohol to college campuses.  Second, "Defendants never argued that no one could circumvent Instacart's policies against such deliveries.  The point is that Instacart prohibits them—a fact that remains undisputed."  Surreply at 1.[9]  The evidence

---

[9] As the Court added at the motion hearing, there can be no dispute that students sometimes procure fake I.D.s in order to circumvent prohibitions on the sale of alcohol to minors.

demonstrates that Instacart communicates this prohibition to its shoppers and that when Instacart learns that deliveries of alcohol are made to college campuses, it blocks further deliveries of alcohol to the address, sends the shoppers a warning, and sends educational information to the users.  Second Weintraub Decl. ¶¶ 3, 4, Ex. A.[10]  Third, and most important, that three individuals were able to circumvent Fizz by Instacart's policy prohibiting alcohol sales to users under 21 has no bearing on whether Defendants <u>target</u> college students.

There is no evidence that Defendants target users under the age of 21.  Accordingly, while Defendants might be seeking to reach a younger audience through Partiful, <u>see</u> Solomon Decl. ¶ 63 ("With its new Fizz service, TECHCRUNCH reported that Instacart was seeking to diversify its revenue streams and to "'tap into a younger demographic that may not be using Instacart.'"), there is no evidence[11] that Defendants are targeting college students, who are FSC's class of purchasers.

The products are not very related.

### d.    Similarity in marketing channels

"Convergent marketing channels increase the likelihood of confusion."  <u>Sleekcraft</u>, 599 F.2d at 353.  "When examining the marketing channels used by the competing companies, [courts] consider where the goods or services are sold, the sales and marketing methods employed, and the class of purchasers exposed to the marketing efforts."  <u>La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.</u>, 762 F.3d 867, 876–77 (9th Cir. 2014).  When the parties sell through the same retailers, courts find an overlap in marketing channels.  <u>See Adidas Am., Inc. v. Sketchers USA, Inc.</u>, 149 F. Supp. 3d 1222, 1242 (D. Or. 2016).

There is certainly overlap in the parties' marketing channels.  Both parties' apps are free and downloadable at the App Store.  <u>See</u> Jacob Decl. Ex. 10.  Both parties "run[] posts

---

[10] Weintraub also notes that the purchases at issue were all made by users over the age of 21, with the shoppers verifying the users' age through ID checks.  <u>Id.</u> ¶ 7.
[11] Solomon asserts that Defendants are "trying to break into the Gen Z market," but as FSC's declarant, he does not have personal knowledge of that fact.  <u>See id.</u>

United States District Court
Northern District of California

on platforms like Instagram and TikTok."  Solomon Decl. ¶ 74 (citing Ex. 60).  In Talent Mobile Development, 2017 WL 6940548, at *7, where comparable facts were present, Judge Carter held that the parties used "virtually identical marketing channels."  While, as discussed above, the class of purchasers differs—FSC targets college students, and Fizz by Instacart does not[12]—the Court cannot say with certainty that the different classes would never see marketing intended for each other.[13]

Accordingly, the Court concludes that the parties employ convergent marketing channels.  That said, "this factor becomes less important when the marketing channel is less obscure. . . . shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."  Network Automation, 638 F.3d at 1151.

### e.    Type of goods/services and degree of care

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution."  Sleekcraft, 599 F.2d at 353. "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely."  Id.  "Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely."  Id.  Thus, in E. & J. Gallo Winery v. Consorzio del Gallo Nero, 782 F. Supp. 457, 465 (N.D. Cal. 1991), where the court found that "the wine-buying public [was] generally unsophisticated 'impulse' buyers who are an 'easy mark for a [trademark] infringer,'" that lack of sophistication enhanced the likelihood of confusion.

---

[12] FSC argues that "Fizz and Partiful . . . both market directly to students using on-campus college ambassadors," see Reply at 10 (citing Solomon Decl. ¶¶ 19, 21, 58–59), but FSC does not point to any Partiful materials on campuses that reference Fizz by Instacart.
[13] This is not like Detroit Coffee Company, LLC v. Soup For You, LLC, 396 F. Supp. 3d 754, 771–72 (E.D. Mich. 2019), where even though both parties "markete[ed] their goods on the internet," the court found that there was not a significant overlap in marketing channels.  There, the plaintiff sold its goods almost exclusively on their own website, while the defendants sold their goods on "Amazon, retail chains, Eastern Market, and their website."  Id. at 771.  The defendants marketed their goods using a marketing agency and social media, while the plaintiff relied on "word-of-mouth."  Id. at 771–72.  And the plaintiff had "a limited online customer base," making it "unlikely" that "a customer would ever encounter both products.  Id. at 772.

24

FSC argues that because the parties' competing products are "free mobile applications distributed through the internet," consumers exercise a low degree of care. Mot. at 8; see also Reply at 12 (citing Talent Mobile Dev., 2017 WL 6940548 (holding that there was a likelihood of confusion where"[b]oth parties market apps that users can download for free" and "the minimal time and effort it would take a customer to download either the Real Caller or the Reel Caller application makes it unlikely that consumers would take much care when downloading the applications"), affirmed by Talent Mobile Dev., Inc. v. Headios Grp., 805 Fed. App'x 506, 508 (9th Cir. 2020)). It adds that the two products are available on the App Store and appear in the same searches, and that "Gen-Z users seeking social coordination tools typically make quick decisions based on app names, spending mere seconds evaluating options before downloading." Id. (citing Solomon Decl. ¶ 74).

Defendants respond that (as FSC asserted in the ShoulderTap litigation) members of Gen-Z are sophisticated app users, and that such consumers would not confuse a self-described "'social media platform for anonymous discussion of college life,' with an on-demand grocery delivery platform." Opp'n at 12. Defendants assert that this is especially so given the differences in the products' marks, user faces, content, and functions. Id.

FSC has the better argument. The parties' apps are both free and available on the App Store. They are therefore not the kind of purchase—like a boat—that a consumer sinks much time into before executing. See Sleekcraft, 599 F.2d at 353 (buying a boat "is not the type of purchase made only on 'general impressions'"); Amazon.com v. Pionera Inc., No. 2:22-cv-01491 DJC AC, 2023 WL 4424649, at *6 (E.D. Cal. July 10, 2023) ("'arguments that Web users exercise a great deal of care . . . are unconvincing.'") (quoting GoTo.com, 202 F.3d at 1209); but see Network Automation, Inc., 638 F.3d at 1153 (recognizing that it is no longer accurate to conclude "that Internet users on the whole exercise a low degree of care."). While Gen-Z consumers are undoubtedly sophisticated when it comes to identifying and downloading apps, see Jacob Decl. Ex. 28 (FSC arguing in HeadSpin litigation: "[FSC's] consumers (American college students) are amongst the

25

most highly sophisticated consumers of technology and social media in the world"), their

sophistication is not really the issue.  As the Ninth Circuit explained:

> [T]he question in this analysis is not how sophisticated web
> surfers are but, rather, how high the cost is of choosing one
> service—that is, one web site—over another on the Web. We
> agree with our previous conclusion that this cost is negligible:
> it is simply a single click of a mouse.

GoTo.com, 202 F.3d at 1209.  In addition, most of the reasons that Defendants identify as

to why Gen-Z users are unlikely to be tripped up do not really fall into "the degree of care"

factor.  See Opp'n at 12.  That the parties' marks look different and that the apps perform

different functions support other Sleekcraft factors, and the Court will not double count

them.

The degree of care here is relatively low.

### f.    Evidence of actual confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof

that future confusion is likely," but "[p]roving actual confusion is difficult[.]"  Sleekcraft,

599 F.2d at 352.  "Because of the difficulty in garnering such evidence, the failure to prove

instances of actual confusion is not dispositive."  Id. at 353.  "Consequently, this factor is

weighed heavily only when there is evidence of past confusion or, perhaps, when the

particular circumstances indicate such evidence should have been available."  Id.; see also

New W. Corp. v. NYM Co. of Cal., Inc., 595 F.2d 1194, 1201 (9th Cir. 1979) ("Neither

actual confusion nor intent are necessary to a finding of [l]ikelihood of confusion.").  Two

categories of evidence are relevant to this factor: (i) evidence of actual confusion and (ii)

survey evidence.

FSC offers no survey evidence.  And, as it confirmed at the motion hearing, it only

offers two instances of confusion: one, a former employee messaging a current employee

upon seeing a Partiful ad with Defendants' mark and writing "girl the way I thought this

was y'all," Solomon Decl. ¶72, and two, a potential investor contacting FSC's CEO to ask

whether FSC and Instacart had a partnership, id. ¶73.  Neither are evidence of customer

confusion.  See Signeo USA, LLC v. Signeo Int'l Ltd, No. 5:11-cv-06370-PSG, 2012 WL 2050412, at *7 (N.D. Cal. June 6, 2012) (holding that "the purchasing consumer [is] the necessary focus of the confusion inquiry").  And they are too "sporadic" and "insufficient" to demonstrate meaningful confusion.  See Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc., No. 17-cv-06393-YGR, 2018 WL 659105, at *7 (N.D. Cal. Feb. 1, 2018) (holding that 11 incidents over 30 months were sporadic and insufficient).

There is therefore not "[e]vidence that use of the two marks has already led to confusion."  See Sleekcraft, 599 F.2d at 352.  But the Court does not weigh this absence heavily, see id., especially as Fizz by Instacart only launched a few days before FSC brought suit.

### g.    Defendant's intent

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived."  Sleekcraft, 599 F.2d at 354.  Although "an intent to confuse consumers is not required for a finding of trademark infringement," Brookfield Commc'ns, Inc., 174 F.3d at 1059, where it exists, it is "strong evidence of a likelihood of confusion," Entrepreneur Media, Inc., 279 F.3d at 1148.  FSC argues that there is "significant evidence" that Defendants chose their marks to infringe on FSC's Marks, but none of the evidence it relies on is terribly persuasive.  See Mot. at 9–10.

First, FSC points to Defendants' having targeted FSC's customers through App Store ads targeted on the word "Fizz."  Id. at 10.[14]  But Defendants running ads on the word fizz does not mean that Defendants were targeting FSC's customers; Defendants may simply have wished to draw customers to Fizz by Instacart.  Second, FSC argues that the day before Defendants launched Fizz by Instacart, they filed trademark applications for Fizz for some of the same classes of goods and services as FSC's pending trademarks.  Id.

---

[14] FSC asserts that "even a search on FIZZ's slogan (i.e., 'Fizz: what's fizzin'?') prompts ads for Defendants' service."  Id.  But FSC does not assert that that was Defendants' design as opposed to simply how the App Store operates when one of the words in the search term—Fizz—is in the name of Defendants' app.

(citing Solomon Decl. ¶ 87). FSC adds that it is unlikely that Defendants failed to run a routine trademark search. Id. But it is just as likely that Defendants did not consider the two marks or goods/services to be close enough to pose a risk of infringement. Third, FSC argues that Defendants concealed their intentions "by first filing its trademark applications in Jamaica before porting them to the USPTO on the eve of launch—a known technique for maintaining 'submarine' marks until a product launch." Id. (citing Solomon Decl. ¶ 88[15]). FSC points to no authority holding that this practice illustrates an intent to infringe.

Fourth, FSC argues that Defendants buried "Fizz's trademark in the buried code or metatags of Defendant Instacart's <FIZZ.COM> domain name." Id. (citing Solomon Decl. ¶¶ 89-9). If Defendants just used the word "fizz" in the code of their Fizz.com website, that hardly demonstrates an intent to infringe. Fifth, FSC asserts that FSC and Defendants have been covered by some of the same publications, id. (citing Solomon Decl. ¶ 53), again suggesting that Defendants must have heard of FSC. But that does not mean that Defendants believed that their mark and product was so similar that there was a risk of infringement.

Defendants' arguments are based on conjecture; there is insufficient evidence of intentional infringement.

### h.    Likelihood of expansion

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." Sleekcraft, 599 F.2d at 354. "When goods are closely related, any expansion is likely to result in direct competition." Id.

FSC argues that the parties "have demonstrated expansion into each other's core service areas, making further direct competition a virtual certainty." Mot. at 10. It insists that while it initially focused "on campus-based social networking, it has methodically

---

[15] It is not clear that Solomon's declaration on this point is truly based on his personal knowledge.

1    expanded to incorporate event planning, community building, and marketplace

2    functionality." Id. at 11 (citing Solomon Decl. ¶¶ 83–85).  And it contends that group

3    purchasing would be "a natural stepping stone" in the development of Fizz Marketplace.

4    Id. (citing Solomon Decl. ¶¶ 43–45, 83–85); Solomon Decl. ¶ 84 ("We are in rapid growth

5    mode, and food delivery is absolutely in the natural zone of expansion of our business.");

6    id. ¶ 85 ("Losing the ability to expand into the event planning market, including snack and

7    beverage delivery, without the overhang of brand confusion, would diminish the ability of

8    our company to attract investors and raise capital.").[16]  FSC also points to its having hired

9    "TikTok's former Head of Creator Monetization as Fizz's new Head of Product to explore

10   . . . new recommendation tools."  Reply at 5 (citing Second Solomon Decl. ¶ 12).

11         Defendants, meanwhile, detail some of the extensive effort and resources involved

12   in launching Fizz by Instacart.  See Weintraub Decl. ¶ 29 (Instacart "was able to launch the

13   app far more quickly and efficiently than it otherwise could have because it was able to

14   leverage the technologies and resources it has developed over more than a decade as an

15   online delivery platform").  For example, Instacart formed partnerships with over 1,800

16   North American retailers, id. ¶ 30, maintains a network of over 600,000 shoppers, id. ¶ 33,

17   "developed sophisticated systems to match orders with available shoppers, generate

18   efficient in-store routes, suggest replacements for out-of-stock items, and facilitate real-

19   time communication with customers," id., and develops a "product catalog" of 17 million

20   unique items that reflects "real-time changes in product availability, pricing, and attributes

21   across nearly 100,000 store locations," id. ¶ 34.  FSC has not done any of this.

22         Nor has FSC identified any other steps it has taken to actually make expansion into

23   group grocery order and delivery services possible.  Hiring someone to help FSC make

24   money on the platform does not mean that person will bring about group snack and

25   beverage ordering and delivery services.  Allowing users to post that they have items to

26   sell via Fizz Marketplace, an anonymous bulletin board, is a far cry from ordering, paying

27

28   _____

[16] At the motion hearing, the Court declined to accept, as untimely, FSC's proffer of new
evidence of expansion.

United States District Court
Northern District of California

for, and delivering party snacks for identified users.[17]  At most, FSC has demonstrated that it might like to be able to monetize the Fizz platform by incorporating snack and beverage delivery, but not that there is a "strong possibility" that it will do so.  See Sleekcraft, 599 F.2d at 354.  There is "no specific concrete evidence that either party intends to enter the other's field" to compete with the other.  See Good Meat Project v. GOOD Meat, Inc., 716 F. Supp. 3d 783, 803 (2024).

### i.    Conclusion as to Sleekcraft Factors

"To prevail on the ultimate question toward which the Sleekcraft analysis is directed—the likelihood of confusion of consumers—[the plaintiff] must show sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not merely 'possible.'"  M2 Software, Inc., 421 F.3d at 1085 (quoting Murray v. CNBC, 86 F.3d 858, 861 (9th Cir. 1996)).  The Sleekcraft factors are "not a rote checklist."  Rearden LLC, 683 F.3d at 1209.  "In other words, 'we do not count beans.'"  Id. (quoting Dreamwerks, 142 F.3d at 1129).  The Court's "determination may rest on only those factors that are most pertinent to the particular case before the court."  Id.

The Sleekcraft factors here are mixed.  While FSC's FIZZ mark is strong, and the marketing channels are similar, the combined marks (which consumers see when at the App Store to download one of the apps) are not similar, and the products themselves are not very related.  Nor is there actual confusion or any concrete evidence of a likelihood of expansion.  FSC has therefore failed to demonstrate that "confusion is 'probable,' not merely 'possible.'"  See M2 Software, Inc., 421 F.3d at 1085.  Accordingly, there is no likelihood of confusion as to the FSC marks and Defendants' marks.

### B.    Irreparable Harm

A party seeking a preliminary injunction must establish a likelihood of irreparable harm absent preliminary relief.  Winter, 555 U.S. at 20.

---

[17] FSC's response to this—"even if some Fizz users are anonymous to each other[,] they are not anonymous to Fizz, for purposes of Fizz facilitating social group ordering," Reply at 13—makes little sense.  How could, and why would, users coordinate on group ordering if they do not know who they are coordinating with?

30

FSC argues that it is entitled to the presumption of irreparable harm because it is likely to succeed on the merits. Mot. at 11. As a result of a 2020 amendment to the Lanham Act, there is a rebuttable presumption of irreparable harm upon a finding of a likelihood of success on the merits of a Lanham Act claim. See 15 U.S.C. § 1116 ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order."); see also 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:47 (5th ed. 2023). Because FSC has not established that it is likely to succeed on the merits, it is not entitled to the presumption.

FSC further argues that it faces irreparable harm because Defendants' (1) use of the identical FIZZ name deprives FSC of control over how consumers perceive its brand (particularly because Defendants encourage alcohol consumption), (2) use of the FIZZ marks interferes with FSC's market position, strategic growth, and investor confidence, and (3) control of fizz.com forecloses FSC's ability to control "the most intuitive domain associated with the FIZZ brand." Id. at 11–14. These arguments fare no better.

### 1.    Loss of Control

The risk that a plaintiff will lose goodwill and the ability to control its mark can amount to irreparable harm. See Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc., 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm. . . . however, the court's pronouncements [must be] grounded in . . . evidence. . . ."); see also SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd., 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) ("Ninth Circuit has recognized that the potential loss of good will or the loss of the ability to control one's reputation may constitute irreparable harm or purposes of preliminary injunctive relief.").

FSC asserts that "Defendants' platform poses a stark reputational risk to Plaintiff that the term 'Fizz' will be connoted with underage drinking." Mot. at 12. It adds that the risk of association between the two brands "is not hypothetical" because Partiful actively

United States District Court
Northern District of California

targets "the college demographic" and so consumers might believe that FSC is embracing "alcohol-centric social facilitation." Id.  This argument is not grounded in evidence.  See Herb Reed Enters., 736 F.3d at 1250 ("court's pronouncements [must be] grounded in . . . evidence. . . ."); Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc., No. C 12-3856 PJH, 2014 WL 4312021, at *10 (N.D. Cal. Aug. 28, 2014) (requiring evidence of harm to reputation, brand, or goodwill and not mere platitudes or conclusory assertions of harm). Here, the evidence is that Fizz by Instacart "does not target college campuses" and has a policy of "not delivering alcohol to college campuses." Weintraub Decl. ¶ 40.  Instacart also has a policy of not delivering to college campuses even if the person ordering is over 21. Id.  While, as discussed above, it is possible to circumvent that policy, FSC's three declarations of individuals who did so represent a very small sample size and do not demonstrate that Fizz by Instacart does a notable amount of business delivering alcohol to college campuses.

FSC's arguments about loss of control and alcohol are therefore unpersuasive.

### 2.    Market position, strategic growth, and investor confidence

A defendant's use of another's mark that threatens a loss of prospective customers can also amount to irreparable harm.  See Newmark Realty Capital, Inc. v. BGC Partners, Inc., No. 16-cv-01702-BLF, 2017 WL 8294175, at *23–24 (N.D. Cal. Nov. 16, 2017).  In Newmark Realty Capital, for example, Judge Freeman held that "numerous third-party declarations" from the plaintiff about how the defendant was soliciting clients, as well as an SEC form showing that the defendant acquired a major competitor of the plaintiff's and planned to use it to provide services that competed with the plaintiff further threatened a loss of potential customers and demonstrated a likelihood of irreparable harm. Id.  Here, FSC asserts that Defendants' use of its FIZZ marks disrupts FSC's market position, threatens its business relationships and investment prospects, and hampers its strategic growth in a way that money could not remedy.  Mot. at 12.

FSC has some evidence on this point, but it is paltry.  It relies on a single investor expressing confusion about Fizz by Instacart.  See Mot. at 13; Reply at 14; Solomon Decl.

¶ 73 ("After Instacart launched its Fizz app, one of said potential investors texted me about what he believed was a partnership between my company and Instacart."). But even that single investor did not express a disinterest in doing business with FSC. See Solomon Decl. ¶ 73 ("Hi Teddy! Really enjoyed our catch up a couple of weeks ago. Looking fwd to more conv later this summer. Btw this is you partnering w Instacart, right?"). FSC has not demonstrated how Defendants are thereby "damaging Fizz's ability to secure funding and partnerships, or media positioning and coverage." See Mot. at 13. Courts have found a similar lack of evidence inadequate. See, e.g., Puma SE v. Forever 21, Inc., No. CV17-2523 PSG E, 2017 WL 4771003, at *4 (C.D. Cal. June 2, 2017) ("because Puma has adduced no evidence that its brand value has been diminished or that monetary damages are insufficient . . . Puma has failed to meet its burden of showing that it will likely suffer irreparable harm if a preliminary injunction is not issued.").

FSC's arguments about the market position, growth and investor confidence are therefore largely unpersuasive.

### 3.    Fizz.com

Use of another's mark in one's domain name or metatags[18] can also lead to irreparable harm, by diverting would-be customers to the infringer's website. Brookfield Commc'ns, 174 F.3d at 1054–61 (discussing domain names), 1061–67 (discussing metatags). FSC argues that Instacart's ownership of fizz.com "gives it control of the most intuitive domain associated with the FIZZ brand, and that consumers looking for FSC "will be diverted to Defendants' competing product." Mot. at 13. FSC offers no evidence that this is so. As Defendants point out, such evidence could take the form of "user surveys, web traffic analysis, or even anecdotal examples of users unable to find Fizz Social." See Opp'n at 14.

FSC insists that "[i]t is undisputed that consumers search for 'Fizz' or visit

---

[18] "[M]etatags are HTML code not visible to Web users but used by search engines in determining which sites correspond to the keywords entered by a Web user." Brookfield Commc'ns, 174 F.3d at 1061 n.23.

United States District Court
Northern District of California

'fizz.com' expecting to reach [FSC's] Fizz Platform, and Defendants' identical infringing FIZZ mark creates an obvious risk of misdirection and confusion." Reply at 14 (citing Brookfield Commc'ns, 174 F.3d at 1062 for the proposition that "even a different domain name could cause 'initial interest confusion'"). But the issue in that portion of Brookfield Communications, 174 F.3d at 1062, was that "[w]eb surfers looking for Brookfield's 'MovieBuff' products who are taken by a search engine to 'westcoastvideo.com' will find a database similar enough to 'MovieBuff' such that a sizeable number of consumers . . . will simply decide to utilize West Coast's offerings instead." In contrast, no consumer would go looking for FSC's Fizz platform (in order to anonymously post things about his or her campus community, or read others' posts), get diverted to Fizz by Instacart's fizz.com website (which directs viewers to download Defendants' app under the tagline "Drinks, snacks, & friends. Order together. Pay your share."), and then decide to stay there because of the convenience of Defendants' "competing product." See Mot. at 13. The two apps do not compete.

Because FSC has not identified any evidence that Defendants' use of the fizz.com website will cause it irreparable harm, FSC's argument about that website are unpersuasive.

FSC has therefore failed to demonstrate irreparable harm.

### C.    Balance of Equities

A party seeking a preliminary injunction must establish that the balance of equities tips in their favor. See Winter, 555 U.S. at 20. Indeed, if a party only raises serious questions going to the merits but demonstrates "a hardship balance that tips sharply" in its favor, and satisfies the other two Winter elements, it is entitled to a preliminary injunction. See Alliance for Wild Rockies, 632 F.3d at 1131–32. FSC argues that if the Court does not grant an injunction, FSC faces "reputational damage, consumer confusion, and potential market exclusion," but if the Court does grant an injunction, Defendants will only suffer minimal hardship, as they would just need to rebrand a new app. Mot. at 14. FSC adds that "any hardship that Defendants may experience is self-inflicted." Id.; 2Die4Kourt

34

1   v. Hillair Cap. Mgmt., LLC, 692 F. App'x 366, 369 (9th Cir. 2017) (holding where

2   infringer complained that "it likely will be forced to shut down," that "when the harm

3   complained of results from a defendant's allegedly infringing conduct, we have

4   nonetheless approved the entry of a preliminary injunction.").

5        FSC's argument relies on premises that the Court has already rejected—that FSC

6   has met its burden in demonstrating that consumers will be confused, or that FSC will

7   suffer irreparable harm in the form of reputational or market damage.  Defendants, on the

8   other hand, argue convincingly that the harm to Instacart from an injunction would be

9   significant, as it has already invested in branding and advertising for Fizz by Instacart,

10  cross-promotion with other apps, and search engine marketing.  See Opp'n at 14 (citing

11  Weintraub Decl. ¶¶ 27–29).  It has spent money to promote the brand on top of the money

12  it spent to develop the app itself.  See Weintraub Decl. ¶¶ 28, 60.[19]  Moreover, there would

13  be consumer confusion if Fizz by Instacart changed its name:

> Existing users would suddenly see a new app on their devices
> that they did not recognize.  Many would likely simply delete
> it.  Likewise, when existing users next tried to open the Fizz by
> Instacart app, they would find that it had disappeared. . . .
> When new users tried to find the Fizz by Instacart app, they
> would find nothing. . . . [the] word-of-mouth momentum would
> continue for some time, but it would now harm Instacart rather
> than help it, because the Fizz by Instacart app would no longer
> exist.

19  Weintraub Decl. ¶ 60.  In addition, "the impression of instability [created] would cause

20  further competitive harm and would be exploited by Instacart's competitors."  Id. ¶ 62.

21       FSC has failed to demonstrate that the balance of equities tip—sharply or

22  otherwise—in its favor.

23  **D.    Public Interest**

24       Finally, a party seeking a preliminary injunction must demonstrate that an

---

[19] This fact undercuts FSC's suggestion that Defendants' investment was only building the Fizz by Instacart app over the existing Instacart grocery delivery e-commerce platform. See Reply at 15.  No doubt a significant percentage of Fizz by Instacart's "development" was on the technology side, but Defendants also point to evidence of their marketing expenditures.

United States District Court
Northern District of California

1  injunction is in the public interest.  See Winter, 555 U.S. at 20.  FSC argues that the public

2  interest favors an injunction because Defendants' use of the FIZZ mark will cause

3  confusion and disrupt the market.  Mot. at 14.  Of course, the public has an "interest in

4  protecting trademarks."  Brookfield Commc'ns, 174 F.3d at 1066; Stark v. Diageo Chateau

5  & Estate Wines Co., 907 F. Supp. 2d 1042, 1067 (N.D. Cal. 2012) ("[p]reventing

6  consumer confusion serves the public interest.").  But because FSC has failed to

7  demonstrate a likelihood of confusion, there is no "significant threat to the public interest

8  in the absence of injunctive relief."  See Good Meat Project, 716 F. Supp. 3d at 806; see

9  also Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc., 559 F.3d 985, 993 (9th

10  Cir. 2009) (recognizing that "the usual public interest concern in trademark cases" is

11  "avoiding confusion to consumers.").

12      FSC has failed to demonstrate that an injunction is in the public interest.

13      In conclusion, then, because FSC is not likely to succeed on the merits and is not

14  likely to suffer irreparable harm in the absence of injunctive relief, and because the balance

15  of equities does not favor FSC and the public interest would not be served by an

16  injunction, injunctive relief is not appropriate.

## IV.    CONCLUSION

18      For the foregoing reasons, the Court DENIES the motion for a preliminary

19  injunction.

20      **IT IS SO ORDERED.**

21      Dated: July 14, 2025

                                          _____
22                                         CHARLES R. BREYER
                                          United States District Judge